Opinion delivered June 16, 1886.

[No. 4097.]

THOMAS GAITHER *v.* THE STATE.

1. THEFT — VERDICT — JUDGMENT—VARIANCE — CASE STATED.—The first count in the indictment charged the appellant with the theft of a yearling. The second count charged him with receiving stolen property, knowing it to have been stolen. The judgment of the court recites that * * * "the indictment being read, the defendant to the charge thereon of theft of a yearling, neat cattle, pleaded not guilty, and the jury, after hearing the evidence, argument of counsel, and charge of the court, retired in charge of the proper officer to consider of their verdict, and after due deliberation," etc.,—rendered a verdict finding the defendant guilty as "charged in the second count of the indictment." The sentence of the court followed the terms of the judgment, and condemned the defendant for the offense of "theft of cattle." *Held,* that the variance between the verdict and the judgment and sentence is fatal, the verdict finding the defendant guilty of receiving stolen property, as charged in the indictment, and the judgment and sentence condemning him for the theft of the cattle.

2. THEFT AND RECEIVING STOLEN PROPERTY are separate and distinct offenses, for neither of which can a conviction be had upon an indictment charging the other.

3. SAME—JUDGMENT.—One of the requisites of a final judgment is that it shall show, in case of conviction, that it is considered by the court that the defendant is judged to be guilty of the offense as found by the jury; or, in case of acquittal, that the defendant be discharged. In this case, the judgment and sentence are without the support of a verdict.

4. SAME—PLEA.—It is essential to the validity of a conviction that the defendant pleaded to the indictment, or that a plea of not guilty was entered for him. The recital in the judgment that the defendant

pleaded not guilty to the theft of the cattle, shows specifically that he did not plead to the second count in the indictment, upon which count the verdict found him guilty. Hence, the conviction is without a plea upon which to stand.

5. PRACTICE—EVIDENCE.—It is a statutory rule of evidence that when a detailed act, declaration, conversation, or writing is given in evidence, any other act, declaration, or writing which is necessary to make it fully understood, or to explain the same, may also be given in evidence. See the opinion *in extenso* for evidence which it is *held* should have been admitted under this rule.

APPEAL from the District Court of Falls. Tried below before the Hon. Eugene Williams.

The indictment in this case contained two counts. The first charged the appellant with the theft of a yearling, the property of R. W. Johnson, in Falls county, Texas, on the first day of April, 1884. The second count charged him with receiving the said animal, knowing it to be stolen. The verdict found the appellant guilty as charged in the second count, and assessed his punishment at two years in the penitentiary.

Robert W. Johnson was the first witness for the State. He testified that, in 1884, he lived in Falls county, near the Bell county line. In the spring of that year, the witness's herd of about one hundred and fifty head of cattle ranged on the Hoolier, Indian Grove, and Deer creeks, in Falls county. The brand of the witness was TIT in the side, and his mark was a crop and split in the right ear, and an under bit in the left. The witness and his brother kept their cattle up and fed them through the winter of 1883 and 1884. They were turned back on the range on or about January 1, 1884. Witness saw them on the range every few days during the months of February and March, 1884. Among the cattle belonging to the witness was a bull yearling, of three-fourths Durham blood, and a red roan, half Durham heifer yearling, both being plainly branded TIT on the side. Witness knew these animals by their flesh marks, as well as by their brands. In March, 1884, the witness bought the half interest of his brother in all of the cattle owned by them jointly, except the beef cattle. The bull yearling and heifer described disappeared from the witness's range on or about March —, 1884, which was after the witness's purchase of his brother's interest. Witness searched the range thoroughly for them, and followed some drovers to pasture in McLennan county. Witness did not

find or hear of the animals until late in October, 1884, when D. J. La Prelle told him that they were in his brother's pasture, in the southern part of Falls county. Towards the close of the said October, the witness, John Frost, and Jake Morris went to La Prelle's pasture and found the two yearlings described, together with one of Jake Morris's yearlings, which disappeared about the time that witness's did. Witness at once recognized his yearlings by their flesh marks. The brand on the bull yearling had been changed to WEV. The change was made by transforming the first T into a W with top bar, by adding side strokes to the I, making an E, and an upward stroke to the last T, making a triangle or closed V. The TIT brand on the heifer had been changed to WR. Parts of the old brands were distinguishable under the new. The dun bull yearling had been altered to a steer yearling. The animals were unmarked when they disappeared, but were marked when found, but witness could not remember the mark. La Prelle's brand had been burned on them low down on the hip. The brand on Jake Morris's yearling had been changed from the original, an X and comma, by lengthening the left lower stroke of the X to make a kind of a Y, and by changing the comma into hieroglyphics impossible to describe. Traces of the old brand were discernible under the new brand. The cattle were taken by witness and Morris back to the range and again placed in their respective brands. The two yearlings belonging to the witness were taken from his possession without his knowledge or consent.

Cross-examined, the witness testified that he did not know the defendant at the time the animals disappeared. Witness lived about twelve miles from Chilton, and about twenty-five miles from La Prelle's pasture. Witness bought his brother's interest in the stock a very short time before the animals were missed. His brother went west just before the cattle were missed. Witness never saw the defendant on his, witness's, range before the cattle were missed. About a week or ten days after the animals were recovered, defendant and one Mark Harwell, neither of whom witness knew, overtook him on the road near his, witness's, home. Witness was on foot, driving a cow, and Harwell and defendant were on horse back. They introduced themselves, and brought up the matter of the yearling by asking if the witness was the man who claimed and got the yearling from La Prelle's pasture. At this point the defense proposed to prove by the witness the conversation which then ensued between the de-

fendant and the said witness. The State objected, and the court sustained the objection. This ruling of the trial court is the subject matter of the last head note of this report. Continuing, the witness said that he knew Jim Carr, who, for a time during 1884, lived about six miles distant from the witness. Witness occasionally saw the said Carr on the range during the spring. Witness's brother, R. A. (Absey) Johnson, went west a few days after he sold his interest in the stock to the witness. His said brother was now at his, defendant's, home, in Falls county, Texas. .

Jake Morris testified, for the State, that he lost a yearling from the same range from which R. W. Johnson lost the two described in the indictment, and at about the same time. Witness testified, as Johnson did, to the discovery of the said animals in La Prelle's pasture, with the brands changed in the manner described by Johnson. Witness knew the defendant lived at or near Chilton, about ten miles from witness's house. In the fall of 1884, prior to the recovery of the cattle as described by witness and Johnson, the witness was in the Hoolier and Indian Grove creek ranges, hunting cattle with D. J. La Prelle. They saw some of the TIT brand cattle, and La Prelle asked witness who gave that brand. Witness told him that R. W. Johnson did. He, La Prelle, then asked who gave the X—comma brand, and witness told him that he, witness, gave that brand. La Prelle then said that he thought he had some cattle in each of those brands in his pasture. Witness knew no such man as W. N. Johnson.

Cross-examined, the witness said that he never knew of the defendant owning any stock, and had never seen the defendant hunting stock on the range of witness and R. W. Johnson. In 1884 the witness lived between three and four miles distant from R. W. Johnson. R. W. Johnson had one older and one younger brother whom the witness knew. Witness could not say that he had ever seen Absey Johnson when the yearlings disappeared. Witness knew the defendant in the spring of 1884.

Don J. La Prelle testified, for the State, that he lived in Falls county in 1884, and knew the defendant and one Mark Harwell. On or about May 8, 1884, witness and some other persons went to the house of Harwell to get him to assist in looking for one of the witness's cows, which he told the witness was on his range. On that occasion Harwell contracted to sell the witness some yearlings, which he described by marks and brands. During

the year 1883 the witness loaned the defendant ten dollars, which loan the defendant promised to liquidate with a yearling. He had not satisfied that debt on the said May 8, 1884. He went with witness and Harwell on the cow hunt on that day. Neither the cow witness was hunting for, nor the yearlings Harwell proposed to sell witness, were found, but a red roan half Durham heifer yearling, branded KB, was found, which the defendant claimed, and delivered to the witness in liquidation of the ten dollar loan described. Witness told defendant that, as he had waited a year for his money, the defendant ought to let him have a two year old. The heifer was past a year old, and was worth from twelve to fourteen dollars. He, witness, took that yearling, with other of his cattle he found on that trip, to his pasture. Witness did not remember that defendant told him where he got that yearling. About two weeks afterwards, during the absence of the witness, the defendant, by his own confession, put in his, witness's, pasture, the animals claimed by R. W. Johnson, in this case, and the animal claimed by Jake Morris, and one or two others which witness, on his return, found in his said pasture. Witness first saw the animals claimed by Johnson and J. W. Morris in his pasture, when, a few days after his return from the cow hunt, he went into the pasture to brand his unbranded stock. Those animals were not in the pasture when witness started on the cow hunt, a few days before. Witness examined the animals, and discovered that their then brands had been run over the original brands, as described by the witnesses Johnson and Morris. Witness was able, by wetting the hair, to trace the original brands. He did not then know to whom the original brands belonged. While on a cow hunt with Jake Morris, in the fall of 1884, witness saw some graded Durham cattle in the TIT and the X—comma brands, bearing a general resemblance to the animals in his pasture, and asked Morris who gave those brands, and then told Morris of the animals in his pasture.

On the cow hunt in May, 1884, when the defendant delivered the heifer yearling to witness in payment of the ten dollar loan, the witness heard Harwell claim that yearling as his property, and agree to let defendant have it to pay his debt to witness. The witness had seen the bill of sale executed by the defendant to La Prelle Brothers, conveying the several animals described. The bill of sale did not describe the bull yearling correctly. It described that animal as a dun heifer branded WEV—, omitting

the top bar. The witness was not present when the bill of sale was executed. It was given to his brother, John La Prelle, who had never seen the cattle. The witness could not say that the defendant was or was not acquainted with marks and brands. When the witness bought the KB yearling from the defendant on May 8, 1884, the animal's hair was long, and witness did not notice that an old brand had been run over. He did not ascertain that fact until the animal shed its hair in the spring. All of the cattle described were put in the witness's brand late in May, 1884. Witness, as an expert stock man, could tell the difference between a brand run on with a rod, and brands made with a stationary branding iron. All of the fresh brands had been run on with a rod over old brands. TIT was easily changed to WEV with an over bar. The R. W. Johnson steer yearling had been recently altered from a bull when witness got it.

John La Prelle testified, for the State, that on the fourth day of June, 1884, the defendant, in Marlin, Falls county, Texas, executed to him, for La Prelle Brothers, a bill of sale to three certain yearlings, which he said were turned into their pasture some time before. Defendant wrote the description of the animals in the bill of sale. Witness had never seen the animals, and could not say whether the bill of sale described them correctly or not. The purchase price was credited on defendant's account. The bill of sale was then read in evidence as follows:

"The State of Texas, }
    "County of Falls. }

"Know all men by these presents, that I, the undersigned, do this day and date, bargain, sell and deliver to La Prelle Bros. —— head of —— described as follows:

| NO. | COLOR | SEX | AGE | BRAND | MARK |
|-----|-------|-----|-----|-------|------|
| 1 | Red | Heifer | 1 | BK | Over bit and under bit in the right, and crop off left ear. |
| 1 | Yellow | Heifer | 1 | WEV | Under slope off right, and crop off left ear. |

for which I hereby acknowledge the receipt of thirty dollars, in full payment for the same; and I furthermore warrant, and agree to defend the title as above described against any claimant whatever.

"This fourth day of June, 1884.        "Tom Gaither."

J. W. Frost testified, for the State, exactly as did the prosecuting witness R. W. Johnson, for whom he worked. Witness knew no such person as W. N. Johnson. The State closed.

A. G. DeBardeleben was the first witness for the defense. He testified that he lived about a half a mile from defendant's house, near Chilton, in Falls county, Texas, during the year 1884. The defendant put some new ground in to cultivation during the spring of that year. Witness knew that the defendant stayed closely at home during the month of March, 1884. Defendant may have gone to Marlin as often as three times during the spring of 1884. Witness could not say that defendant was not absent from his home as long as a day at a time during the spring of 1884. Defendant was scarce of farm stock, and kept his horses busy during the month of March, 1884, and witness did not think that he went cattle hunting during that month.

W. J. Wright testified, for the defense, that in 1884 he lived about three miles from the residence of defendant and Harwell. Late in March, 1884, a man who gave his name as Newt Johnson, and one James Carr, whom the witness knew, brought five head of yearlings to witness's place, and asked for the witness's brother, Will Wright, to whom he said he had contracted the yearlings. Witness told him that his brother was then in Temple, and that he could not say when he would be back. Johnson expressed great disappointment, and asked witness to pen his yearlings in the lot, and turn them out with his cattle, and hold them until his return. He and Carr then left, and returned a few days afterwards, and again asked for witness's brother Will, who was not at the house. They then went away. Among the yearlings brought to witness's house by the said Johnson and Carr, was one dun steer yearling branded WEV, with an over bar; another was a red heifer yearling branded WR; another was branded Y and some indescribable hieroglyphics. The brand on the remaining yearling the witness could not remember. Witness turned those yearlings out with his cattle, as Johnson requested him to do, and they remained on the range for some time afterwards. The dun steer and red heifer frequently came up with the witness's cattle, but the other yearlings never did. Witness's brother did not buy the yearlings, and witness told Johnson that Mark Harwell would. Johnson asked witness to tell Harwell that he would like to sell the yearlings to him. Johnson was a tall, slender man, between twenty and twenty-five years of age. He had dark hair, and the witness thought,

a light mustache. He rode a brown or bay horse on both visits to witness's house. Carr was of lighter complexion and heavier build than Johnson, and rode a dun pony. Witness then knew that an indictment for horse theft was pending against Carr in the district court of Falls county.

Cross-examined, the witness said that the animals brought to his house by Johnson and Carr did not look to him like fine stock. They had then been branded not exceeding a week. Witness could not tell that the brands had been changed. Witness did not see Johnson and Carr get the cattle up on their second visit to his house, and did not know that they did so. It was about the last of March, 1884, when Johnson and Carr came to the witness's house with the yearlings. Carr called Johnson "Newt." Carr was then living on Deer creek. Jake Morris lived on the Hoolier, about twelve miles from the witness. The same brand was on no two of the yearlings, and the dun steer seemed to have been freshly altered. The animals were all freshly marked, but witness did not remember the marks. Witness never saw the man Johnson prior to his first mentioned visit, and has not seen him since his last visit to his, witness's, house.

John Greer testified, for the defense, that he lived, in March, 1884, between Wright's place and the Hoolier and Indian Grove creeks. While hunting horses one evening late in the said March, witness saw James Carr, and a man whom he did not know, driving five or six yearlings, one of which was a dun steer branded WEV with an upper bar, towards Wright's place, from the direction of the Hoolier. Carr asked if he was traveling right to get to Wright's house, and witness told him that he was. Carr was riding a dun pony, and the stranger, who was a tall, slender man, a horse, and not a mule. Witness had never seen either Carr or the stranger since.

Mark Harwell testified, for the defense, that, on or about the first day of April, 1884, he contracted with a man named Johnson for the purchase of some yearlings. The witness had to work the road on the day they were to be delivered, and asked the defendant to receive the animals for him. Defendant was then on the way to the house of the witness's mother. When witness got home in the evening he found defendant, James Carr, Johnson, T. C. De Graffenried, and Tom Ellison at his house. There were five head of yearlings in the bunch, which the witness described as did the witness W. J. Wright. Witness found, on reaching home, that defendant had taken a bill of sale

of two of the yearlings to himself, and had given Johnson an order on him, witness, for the eighteen dollars purchase money. Witness bought the other three, paying nine dollars per head for them. Witness and defendant sold the animals described to La Prelle Brothers, and they were driven to La Prelle's ranche by defendant and Ellison, except one of them, which defendant sold to D. J. La Prelle on the range. Witness had seen the cattle on the range before he bought. He often asked about their ownership, and was as often asked by others. James Carr, who left the country soon after the cattle transaction, lived near Jake Morris's place, and knew the country well. Witness did not know Johnson, and first saw him when he contracted to buy the yearlings, and last saw him when he paid for the yearlings. He told witness that he lived in Bell county. The brands on the yearlings were fresh when the witness first saw them, and witness did not then discover that they were run over old brands, nor did he ascertain that fact until they shed off. Witness was not at home when the bill of sale from Johnson to the defendant was written. The hand writing of the bill of sale, the witness thought, was defendant's. Witness was then in the defendant's debt, and had authorized him to draw on him. Tete Fountain and Bud Gaither were at the witness's house on the evening the cattle named were delivered. Tom Ellison was sick in bed. Carr claimed no interest in the cattle, but said that the cattle were all right, and that the defendant lived in Bell county, Texas, on Elm creek. Witness was in Marlin on the fourth day of June, 1884, and saw the defendant there. He was drinking.

Cross-examined, the witness testified that he lived on Deer creek, about nine miles from Marlin, on the public road leading from Marlin to Durango. Witness lived about ten miles from Jake Morris. Johnson lived about fifteen miles from the La Prelle pasture. A negro named Masters came to witness's house on the evening of the cattle transaction with Johnson. Another negro named Ebenezer Williams was at work all of that day on witness's crib. The defendant lived at Chilton, about three miles from the witness. He was witness's brother-in-law. Witness was on the prairie with La Prelle and defendant on May 8, 1884, when defendant sold La Prelle the BK yearling. Witness did not claim that yearling, and tell defendant he could use it to pay his debt to La Prelle.

W. J. Armstrong testified, for the defense, that he lived on the "Carolina" place, near the witness Wright's. Two yearlings,

one a dun, branded WEV, ran with witness's and the Hedrick and Wright cattle, for a time after the latter part of March, 1884. They were marked, and their brands were fresh. They were graded cattle.

Mrs. Mark Harwell testified, for the defense, that some time in April, 1884, Carr and a man named Johnson brought some yearlings to her husband's house, which her husband and defendant bought.

Ebenezer Williams testified, for the defense, that he worked for Mr. Harwell on a house on his place, in April, 1884. The house was near the lot. On one of the days, while witness was at work, a man named Johnson and another man brought some yearlings to Harwell's house, and turned them into the lot. One of the yearlings was a dun and another was a red animal.

Gus Tomlinson testified, for the defense, that he saw a dun steer yearling branded WEV, and a red heifer yearling branded WR, on the range near the Carolina place, in March, 1884. The hair was then long, and the brands, which were fresh, looked to have been "run on." Witness next saw those animals in April, on the same range, and he next saw them in the possession of R. W. Johnson, Jake Morris and John Frost, at the Grange store at Camden, Texas.

T. C. De Groffenried testified, in substance, that he was present at Mark Harwell's house, early in April, 1884, when the men, Johnson and Carr, brought the yearlings described to Harwell's house, and sold them to defendant and Harwell, as stated by Harwell on the stand. Harwell paid Johnson in silver and currency for the five head of yearlings, taking up defendant's order for eighteen dollars. The bill of sale from Johnson to defendant was written by defendant and signed by W. N. Johnson, and was attested by the witness and Tom Ellison.

Tom Ellison corroborated the testimony of this witness.

The defense next introduced in evidence the bill of sale, dated April 1, 1884, signed by W. N. Johnson and attested by De Graffenried and Ellison, purporting to convey to defendant a dun steer yearling branded WEV, and a red heifer yearling branded KB. The defense closed.

W. Sylvester testified, for the State, in rebuttal, that as late as April 10, 1884, he saw two yearlings, a dun steer branded WEV, and a red heifer branded WRB, near the Carolina place. He then went to Colonel Gaither's place, and asked defendant who

owned them, and he said that he did not know.   Defendant and witness were both drinking, but neither was drunk.

Robert Moore testified, for the State, in rebuttal, that James Carr commenced work for him on the twenty-ninth day of March, 1884, and worked steadily for two months, losing but one day, which was the nineteenth day of April.   On each and every other day of the time between March 29, 1884, and two months thereafter, Carr was on the witness's place, eight miles distant from Harwell's.   During the first ten days of his service, Carr broke wild horses for witness.

McClatchey testified, for the defense, that he lived near Durango, about eight miles from Robert Moore's place, and about nine miles from the defendant's place.   Witness saw James Carr several times during the spring of 1884, hunting stock in the vicinity of his, witness's, residence.   On one occasion two negroes were with the said Carr, riding wild horses, which the witness thought belonged to Robert Moore.

The motion for new trial raised the questions discussed in the opinion.

*Oltorf & Harlan* and *Martin & Dickenson*, for the appellant.

*J. H. Burts*, Assistant Attorney General, for the State.

WHITE, PRESIDING JUDGE.   Appellant was convicted upon an indictment containing two counts, the first for theft, and the second for receiving stolen property knowing it to have been stolen.

We here copy in full the judgment of the court, as follows: " On this tenth day of February, A. D. 1886, this cause coming on to be heard, came the State of Texas, by her county attorney, and announced ready for trial.   Thereupon came a jury of good and lawful men, to-wit: L. W. Kelley and eleven others, who were selected, empaneled, and sworn according to law, and the indictment being read, the defendant to the charge therein of theft of a yearling neat cattle, ' plead not guilty,' and the jury, after hearing the evidence, argument of counsel, and charge of the court, retired, in charge of the proper officer, to consider of their verdict, and after due deliberation returned into open court, the defendant being present, the following verdict, to-wit: ' We, the jury, find the defendant guilty as charged in the second count of the indictment, and assess his punishment at two

(2) years' confinement in the penitentiary. L. W. Kelley, fore-man.' Wherefore it is considered by the court that the defend-ant is guilty (of the theft of a yearling neat cattle) as charged in the indictment, and as found by the verdict of the jury. It is therefore ordered, adjudged, and decreed, by the court, that the defendant, Thomas Gaither, be condemned to imprisonment in the State penitentiary for a period of two years, in accordance with the verdict of the jury and judgment of the court, and that he be remanded to the custody of the sheriff of Falls county, and by him to be safely confined in the common jail of Falls county to await the further orders of this court."

The sentence of the court followed the terms of this judgment, and appellant was condemned to imprisonment in the peniten-tiary for the offense of "the theft of a yearling." It is manifest that the judgment and sentence are not supported by the verdict. The verdict found the defendant guilty on the second count of the indictment, which was a charge for receiving stolen prop-erty, knowing it to be stolen. The judgment and sentence were for theft of an animal as charged in the first count of the indict-ment.

It is now well settled in this State that theft and receiving stolen property, knowing it to be stolen, are two separate, dis-tinct, and specific offenses, and that under an indictment for theft, a party can not be convicted of receiving stolen property, and vice versa. (Brown v. The State, 15 Texas Ct. App., 581, and authorities.)

One of the requisites of a final judgment, as declared by our statutes, is that the said judgment must show, in the case of a conviction, that it is considered by the court that the defendant is adjudged to be guilty of the offense as found by the jury; or, in case of acquittal, that the defendant be discharged." (Code Crim. Proc., Art. 791, subdiv. 9.) This mandate of the law has not been complied with in the judgment rendered in this case. In a felony case the trial must be by jury, and it is the verdict of the jury which gives validity and effect to the judgment as to the character of the crime which has been committed; and where the jury have determined the crime upon the special issues fairly submitted to them by the court, it is well settled that the court can not look beyond the verdict to any fact apparent in the record to aid the judgment. (Ledyard v. Brown, 27 Texas, 393; Raines v. Calloway, Id. 679.) In this case there is a fatal variance between the verdict and the judgment and sentence,

and the latter are virtually without a verdict, which is absolutely essential to their support, and consequently they cannot be permitted to stand.

Another fatal objection to this conviction is that the verdict of the jury as rendered, even if the judgment had been in accordance with said verdict, can not stand, because the judgment as above set forth shows that the defendant *never pleaded to the second count in the indictment,* that is for "receiving stolen property," of which said verdict finds him guilty, but, on the contrary, said judgment expressly declares that "the indictment being read, the defendant *to the charge therein of theft of a yearling neat cattle, plead not guilty."* If defendant had pleaded generally "not guilty" to the indictment, that would have been sufficient to put in issue all the counts charged in the indictment. But a plea as to one count alone, specifically stating the count, must be held as intending to, and as in fact, only embracing said count, and especially when the other counts charge separate and distinct offenses, as in this instance. It is a rule too well established to require a citation of authority at this late day that unless the record on appeal shows affirmatively that a defendant on trial of a criminal offense pleaded to the charge preferred against him, and upon which the prosecution is predicated, a judgment of conviction will be set aside, because where there is no issue for the jury to try, or for the court to determine, there being no plea to the second count of the indictment, the verdict rendered by the jury was upon an issue that had never been made by a plea, and, consequently, had the judgment been in accordance with the verdict, it would have been set aside for this reason also.

Looking to the conduct of another trial of this case, we are of opinion that the court erred in excluding the testimony proposed to be elicited on cross examination of the State's witness R. W. Johnson, as shown by defendant's second bill of exceptions. Johnson was the alleged owner and prosecutor. On his examination in chief he stated that, about three or four weeks after he had recovered the stolen yearling, he met appellant and one Mark Harwell, and had a conversation with them about the yearlings. The defendant's counsel asked him to state the conversation, to which the State's counsel objected, because the conversation was brought about by defendant, and showed that it was not the first time that defendant had learned of the charge against him, and that the declarations made by defendant in

said conversation would be self serving, and therefore inadmissible. The court excluded the testimony. This ruling, we are of opinion, was erroneous. The State's witness had detailed an act of the defendant, to-wit, "that Gaither had met witness in the road near his residence, had introduced himself and Mark Harwell to witness, and that Gaither, this appellant, began the conversation by asking about the yearling that had been recovered by witness, the subject not having been mentioned by witness."

The statutory rule upon the subject is that when a detailed act, declaration, conversation or writing is given in evidence, any other act, declaration or writing which is necessary to make it fully understood, or explain the same, may also be given in evidence. (Code Crim. Proc., Art. 751; Davis v. The State, 3 Texas Ct. App., 91; Greene v. The State, 17 Texas Ct. App., 395; Harrison v. The State, 20 Texas Ct. App., 585; Rainey v. The State, Id., 470.)

There are other irregularities in the record which we do not deem it essential to notice, save by way of remark that other material errors complained of and not discussed by us are of a character deemed not likely to occur on another trial.

For the errors above discussed, the judgment is reversed and the cause is remanded.

*Reversed and remanded.*